**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leovigildo BAZAN, Defendant-Appellant.**

No. 79–5442.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1981.

Roland E. Dahlin, II, Federal Public Defender, Karen Kennedy Brown, Gustavo L. Acevedo, Asst. Federal Public Defenders, Houston, Tex., for defendant-appellant.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before RUBIN, HENDERSON and REAVLEY, Circuit Judges.

HENDERSON, Circuit Judge:

Leovigildo Bazan appeals his conviction of knowingly transporting illegal aliens within the United States in violation of 8 U.S.C.A. § 1324(a)(2).[1] Bazan was found innocent of participating in a conspiracy as alleged in Count One of the indictment, but was convicted of transporting five aliens, each the subject of a separate count: Rosario Balderas-Cruz (Count Two); Isidro Balderas-Amador (Count Three); Crecencio Guerrero-Cruz (Count Four); Alfonso Mendoza-Sanchez (Count Five); and Justo Martinez-Torres (Count Six).

Bazan urges that the aliens' courtroom identification testimony should have been suppressed as the unreliable product of a previous out-of-court confrontation. We reject this contention. We also find that the evidence was sufficient to sustain the conviction and that the government's closing comments do not necessitate reversal.

Late in 1978 Justo Martinez-Torres and his son crossed the Rio Grande River from Mexico and walked to the vicinity of Concepcion, Texas where they were employed by a farmer named Vera for three weeks. While on the Vera ranch, Martinez-Torres and his son worked with Bazan.[2] Martinez-Torres requested Bazan to arrange for him and his son to travel "further on" in search of work. Bazan said he would take care of it advising Martinez-Torres he could catch a ride on a truck going north. That night Martinez-Torres and the other aliens assembled in the brush near Bazan's house.

The other four aliens (the transportation of whom was charged in Counts Two through Five) arrived in Concepcion together as part of a large group of aliens. When they arrived an alien who was deported before the trial spoke with Bazan and arranged their transportation.[3] That night the aliens waited in the brush on the Bazan ranch until the truck arrived. All the aliens, Martinez-Torres among them, got into the truck and traveled to Arkansas. A week later they were arrested there while working for B.O. Temple.[4]

The aliens were taken to the detention camp at Port Isabel, Texas. Agents of the Border Patrol used a photo spread in an effort to determine who had arranged for the aliens' transportation within this country, but to no avail. The agents then placed four of the aliens (all but Martinez-Torres) in an unmarked van equipped with one-way windows, and followed their directions to Concepcion. There they drove around for about an hour and a half and, after passing several ranches, the aliens finally recognized the brushy spot where they had stopped earlier. An agent took pictures of the area, which was littered with personal effects. These photographs were admitted in evidence. The agents then drove to Bazan's house, which was nearby. From the van the "aliens identified Mr. Bazan as the man they had talked to before making arrangements to be transported

1. 8 U.S.C.A. § 1324(a)(2) provides that "Any person . . . who knowing that he is in the United States in violation of law, and knowing or having reasonable ground to believe that his last entry into the United States occurred less than three years prior thereto, transports . . . within the United States by means of transportation or otherwise, in furtherance of such violation of law any alien . . . not duly admitted by immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter . . . shall be guilty of a felony. . . ."

2. No testifying alien was certain of Bazan's name.

3. Balderas-Amador, Balderas-Cruz and Martinez-Torres all testified at the trial through an interpreter. Although the testimony is somewhat confusing in translation, all three identified Bazan as the man they saw in Concepcion. (Balderas-Amador equivocated under cross-examination.) Only Martinez-Torres testified to speaking with Bazan. Balderas-Cruz and Balderas-Amador both denied having had conversations with Bazan.

4. Temple pleaded guilty to lesser charges before Bazan's trial.

north." Testimony of Agent Diaz, Tr. 74–75; see also Tr. 78, 86.

Bazan contends that the circumstances of the van trip to his ranch were so prejudicial that subsequent in-court identification testimony by the participants was unreliable as a matter of law. *See Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). He complains that he was alone when the aliens saw him from the van, even though the Supreme "Court pointed out in *Stovall* that '[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned.'" *Foster*, 394 U.S. at 443, 89 S.Ct. at 1128–29, 22 L.Ed.2d at 406–07, *quoting Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). He also notes that this court has "previously indicated that one of the factors on which the fairness of pretrial lineup procedures depends is whether witnesses were allowed to 'discuss among themselves their conclusions.'" *Swicegood v. Alabama*, 577 F.2d 1322, 1327 (5th Cir. 1978), *quoting Pearson v. United States*, 389 F.2d 684, 688 (5th Cir. 1968).

Bazan's conviction cannot stand if the identification testimony upon which it rests followed an extrajudicial confrontation "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process." *Stovall*, 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206. In the final analysis "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154 (1977).

■ This circuit has developed a two-step test for determining whether pretrial confrontation with a testifying witness results in a deprivation of due process.[5] "The district courts are to determine separately (1) whether the procedures followed were 'impermissibly suggestive', and then (2) wheth-

er, being so, they created 'a substantial risk of misidentification'." *United States v. Smith*, 546 F.2d 1275, 1279 (5th Cir. 1977), *quoting United States v. Henderson*, 489 F.2d 802, 805 (5th Cir. 1973), *cert. denied*, 417 U.S. 913, 94 S.Ct. 2612, 41 L.Ed.2d 217 (1974).

■ Bazan does not suggest any alternative course the police might have followed in their search for the person responsible for the transportation of these aliens. He concedes that prior to the van trip the government had no reason to bring Bazan in for a lineup. There is no evidence that the government agents had any idea of the identity of the culprit when they initiated the van trip.

*Stovall* criticizes the use of "*unnecessarily* suggestive" confrontations. 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206 (emphasis supplied); *cf. Neil v. Biggers*, 490 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401, 411 (1972) ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous."). The appellant does not cite a single instance of a conviction reversed because of a bad pretrial confrontation where no alternative method of investigation would have revealed the identity of the defendant. There is case law in this circuit to the effect that a defendant's failure to show that a pre-trial confrontation was "impermissibly" suggestive ends judicial inquiry, *e. g. Branch v. Estelle*, 631 F.2d 1229, 1234 n. 5 (5th Cir. 1980); *Smith*, 546 F.2d at 1281, and since "there is surprising unanimity" that a prosecutor should "justify his failure to use a more reliable identification procedure," *Kirby v. Sturges*, 510 F.2d 397, 405–06 (7th Cir.) *cert. denied*, 421 U.S. 1016, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975), quoted with

---

5. Although in person show-ups are preferable to displays of photographs, *United States v. Gidley*, 527 F.2d 1345, 1352 (5th Cir.), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976), the "two-tier" approach is used to review all allegedly prejudicial confrontations,

whether involving photographs or live subjects. *Preacher v. Estelle*, 626 F.2d 1222, 1223 n. 3 (5th Cir. 1980); *cf. United States v. Cueto*, 611 F.2d 1056, 1063 (5th Cir. 1980) (citing precedent interchangeably).

approval in *Manson*, 432 U.S. at 111, 97 S.Ct. at 2251, 53 L.Ed.2d at 152 (in support of refusal to adopt *per se* rule), Bazan's inability to suggest a permissible alternative is significant. However, "[i]n determining whether the photographic display[6] was impermissibly suggestive, we evaluate only the picture spread itself—whether other more desirable methods of identification were available or whether there was a compelling need for a photographic display are not relevant in the determination." *United States v. Gidley*, 527 F.2d 1345, 1350 (5th Cir.), *cert. denied*, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976); *accord, United States v. Allison*, 616 F.2d 779, 783 (5th Cir. 1980); *United States v. Sutherland*, 428 F.2d 1152, 1156 (5th Cir.), *cert. denied*, 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1970); *cf. Branch*, at 1234 (no constitutional right to most reliable identification procedure). We need not dwell on this apparent inconsistency of approach, since in any event there was no "substantial risk of misidentification" at trial.[7]

▮ In ascertaining whether the in-court identifications were reliable, we must look to the "totality of the circumstances," *Stovall*, 388 U.S. at 302, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206, considering such factors as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 490 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972).[8] We conclude that the testimony of Balderas-Amador and Balderas-Cruz[9] was admissible as independent of the van show-up. *Coleman v. Alabama*, 399 U.S. 1, 3–6, 90 S.Ct. 1999, 2000–01, 26 L.Ed.2d 387, 393–95 (1970); *Gidley*, 527 F.2d at 1351.

During the trial no one focused on the van trip. *Cf. United States v. Mann*, 557 F.2d 1211, 1216 (5th Cir. 1977) (plain error). In fact, Balderas-Cruz, the only alien who discussed the trip, denied having identified Bazan at his ranch. Tr. 124.[10] Our independent examination of the transcript satisfies us that the courtroom identifications were not the product of the viewing at the ranch, but rested upon the witnesses' observations of Bazan when they arrived from Mexico.

Both Balderas-Cruz and Balderas-Amador were able to see Bazan from the bush. If Balderas-Amador's testimony was weak, it was a matter to be emphasized to the jury, not to this court. *See Foster*, 394 U.S. at 446 n. 2, 89 S.Ct. at 1130 n. 2, 22 L.Ed.2d at 406 n. 2. That Balderas-Cruz was unable to identify Bazan at the ranch also goes to the weight of his testimony, not to its admissibility.[11] This is not a case where the police repeatedly exposed witnesses to a suspect in a prejudicial setting. *See Foster;*

6. Bazan complains about a live show-up, not a photographic display, but our inquiry is the same. See note 5.

7. *Preacher v. Estelle* bypassed the impermissibly suggestive question to consider reliability, noting that since the Supreme Court has refined the standards for evaluating identification testimony, it has taught that "reliability is the linchpin." 626 F.2d at 1223, *quoting Manson*. Even *Smith* discussed the potential for misidentification.

8. The *Biggers* components govern the admission of both in-court and out-of-court identification. "[T]he reliability of the identification [is] the guiding factor in the admissibility of both pretrial and in-court identifications... Thus, *Biggers* is not properly seen as a departure from the past cases, but as a synthesis of them." *Manson*, 432 U.S. at 107 n. 9, 97 S.Ct. at 2249 n. 9, 53 L.Ed.2d at 149 n. 9.

9. Martinez-Torres was not in the van, and Bazan does not maintain that his testimony was the product of a suggestive show-up.

10. Only Agent Diaz testified that the aliens identified Bazan at the ranch. Bazan did not object to this testimony as hearsay, and does not now allege that he was denied his right to confront the witnesses against him. See U.S. Const. amend. VI; *United States v. Cain*, 615 F.2d 380, 382 (5th Cir. 1980).

11. The testifying agent said "the aliens" identified Bazan, but did not say "all the aliens" or specifically mention Balderas-Cruz. *See* 4 Weinstein's Evidence ¶ 801(d)(1)(C)[01] at 801–131 n. 31 (1979).

*Preacher v. Estelle*, 626 F.2d 1222, 1223 n. 4 (5th Cir. 1980). The aliens led the agents to Bazan; not vice versa. The reliability of the identifications is also demonstrated by the testimony of Martinez-Torres, who was not on the van trip and nevertheless positively identified Bazan. *Gidley*, 527 F.2d at 1345 n. 4; *Canal Zone v. Green C.*, 521 F.2d 241, 242 (5th Cir. 1975).

Bazan also asserts that the government's evidence was insufficient to support his conviction. He does not so much argue that the government failed to prove any particular aspect of its case as he reiterates that the testimony of the aliens was incredible as a matter of law. Since the evidence was admissible, credibility choices were for the jury. The verdict demonstrates that the jury believed the government's evidence, and there was substantial evidence of each element of the crimes. See note 1.

■ All three of the aliens who testified said they boarded the truck at Bazan's ranch. The testimony of Balderas-Cruz and Balderas-Amador could be interpreted to mean that all the aliens, even those who were not witnesses, were on the truck.[12] Martinez-Torres testified that Bazan arranged for his transportation. Similarly, although Balderas-Cruz denied that he had spoken with Bazan, he did say that Bazan arranged for the transportation of his group. From this evidence, the jury could have found, beyond a reasonable doubt, that Bazan arranged to transport these aliens knowing that they had just arrived in this country and had no right to be here. *See generally Jackson v. Virginia*, 443 U.S.

307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

In his closing argument to the jury, Bazan's lawyer remarked that the government could easily have traced ownership of the truck used to transport the aliens. He then suggested that the only explanation for the government's failure to prove that Bazan owned the truck was that it belonged to somebody else. In rebuttal, the district attorney replied "I submit to you this, if Mr. Temple had had anything of a favorable nature to say as to either Defendant—" and was thereupon interrupted by Bazan's objection. Tr. 200. Although the objection was overruled, the district attorney never again mentioned Temple. Bazan now says that the prosecutor's statement impermissibly shifted the burden of proof.[13] Brief 14, 30.

■ The inference that Bazan's counsel attempted to draw was itself improper. (There is no reason to believe that the government had greater access to the truck than did Bazan.) *Luttrell v. United States*, 320 F.2d 462, 465 (5th Cir. 1963); *cf. United States v. Sircovich*, 555 F.2d 1301, 1302 (5th Cir. 1977) (no inferences, either way, from witness' decision to invoke fifth amendment privilege). *See generally United States v. Dibrizzi*, 393 F.2d 642, 646 (2d Cir. 1968). Once he made the statement, the government was free to respond that Bazan had not contradicted its evidence.[14] *United States v. Ivey*, 550 F.2d 243, 244 (5th Cir.), *cert. denied*, 431 U.S. 943, 97 S.Ct. 2662, 53 L.Ed.2d 263 (1977), *denying petition for*

12. Apparently all the aliens mentioned in the indictment were present at the trial. Balderas-Cruz said he entered this country "with more companions" and answered "Yes" when asked "Are some of them locked up with you today?" Tr. 111. He testified that when he first encountered Bazan he was "[w]ith three companions that are here and others that are gone." Tr. 112. He also mentioned that he, Balderas-Amador, Mendoza-Sanchez and Guerrero-Cruz went on the van trip and that "we recognized the place where we had come." Tr. 123. Balderas-Amador stated that he reached the Bazan ranch "with my friends," and answered "Yes" when asked "Are some of your friends that you crossed with the ones that you were sworn in

with today?" Tr. 20–21. He did not refer to the other aliens by name.

13. Bazan does not contend that the statement was a comment on his failure to take the stand.

14. The court's instruction to the jury included the following: "The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a Defendant; for the law never imposes upon a Defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence." Tr. 212. *Cf. Branch*, at 1234 (curative instruction).

*rehearing of* 546 F.2d 139; *United States v. Driscoll,* 454 F.2d 792, 800–01 (5th Cir. 1972); *Kroll v. United States,* 433 F.2d 1282, 1290 (5th Cir. 1970), *cert. denied,* 402 U.S. 944, 91 S.Ct. 1616, 1618, 29 L.Ed.2d 112 (1971). *See McClanahan v. United States,* 230 F.2d 919, 925–26 (5th Cir.), *cert. denied,* 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47 (1956).

AFFIRMED.