**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Damian TAPIA, Defendant-Appellant.**

**No. 84–3419.**

United States Court of Appeals, Eleventh Circuit.

May 30, 1985.

Bryan C. Hugo, Sarasota, Fla., for defendant-appellant.

Warren A. Zimmerman, Asst. U.S. Atty., for plaintiff-appellee.

Before HILL and FAY, Circuit Judges, and HOFFMAN *, District Judge.

---

* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting    by designation.

PER CURIAM:

The defendant, Damian Tapia, and his brother, Ruben Tapia, were brought to trial on a four count indictment charging them with conspiracy to transport illegal aliens in violation of 18 U.S.C. § 371, two substantive counts of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(2) and 18 U.S.C. § 2, and peonage in violation of 18 U.S.C. § 1581. Both defendants were found guilty of conspiracy and two counts of transporting illegal aliens, and both were acquitted of the peonage charge. Appellant Damian Tapia was sentenced to concurrent terms of two years on each count, and appeals from these judgments of conviction.

The government's case-in-chief consisted primarily of the testimony of two El Salvadoran refugees, Guadalupe Nicolas Ortiz-Vaquerano (hereinafter Ortiz) and Miguel Angel Reyes-Martinez (hereinafter Reyes). These were the two illegal aliens allegedly transported by the defendants, and were the individuals who formed the basis for the two substantive counts of transporting illegal aliens. Both Reyes and Ortiz testified that they had illegally entered the country approximately one month prior to the activities that led to the indictment of the defendants. Both took up residence in a house in Houston. The defendants were also illegal aliens, Damian Tapia having entered the country illegally about eight years prior to the indictment, and Ruben Tapia having illegally entered the country about four years prior to the indictment.

In late October, 1983, Ruben mentioned to Ortiz and others that employment was available in Florida picking tomatoes for Ruben's brother, who was a contractor. Ortiz mentioned to Ruben Tapia that he was in the United States illegally; however, he did not tell Ruben how long he had been in Houston or the United States. Ruben replied that this would be no problem since he knew how to avoid Immigration officials during the trip from Houston. Ruben further told Ortiz that a fee of $300.00 would be charged for the transportation, but that this fee could be paid out of the wages earned by Ortiz working for Ruben's brother, Damian Tapia. This $300.00 fee was over and above a separate charge for gasoline, which Ortiz was unable to pay.

Ortiz testified that Ruben left Houston at night, carrying Ortiz, Reyes and twelve Mexicans, all of whom had lived next door to Ortiz in Houston. During the nighttime ride, Ruben on three occasions alerted his passengers to take cover on the floor of the vehicle to avoid detection by Immigration officials. The van arrived in Alabama the following morning, at which time Ruben introduced Ortiz and his other passengers to the appellant, Damian Tapia. The appellant discussed with Ortiz the prospect of Ortiz picking tomatoes for the appellant in Florida. Ortiz testified that at the end of the day a caravan of five vehicles began a nighttime journey from Alabama to Palmetto, Florida. Ortiz stated that before the departure from Alabama, and in the presence of Damian Tapia and others, it was decided that Ruben Tapia would drive the lead vehicle in order to look for Immigration officials. Damian Tapia drove his family in a yellow bus, while Ortiz and Reyes rode in a separate vehicle within the caravan.

The government's other witness, Reyes, described a similar meeting with Ruben Tapia in Houston during which Ruben promised the opportunity of employment in Florida with his brother who was a contractor. Reyes stated that both he and Ortiz were carrying a single suitcase on the rides from Houston to Florida via Alabama.

Reyes testified about the details of a conversation that occurred before the caravan left Alabama. He stated that Ruben and Damian were grouping particular passengers among the various vehicles. It was decided that the Cubans would ride in the yellow bus driven by Damian Tapia because Immigration officials would leave them alone. The Mexicans and El Salvadorans were directed to another van. In agreeing to go to that van, Reyes confirmed to Damian Tapia that he was an illegal. Upon arriving in Florida, Reyes

was informed by the defendants that he would be charged $300.00 for the transportation.

The statute that the appellant was charged under, 8 U.S.C. § 1324(a)(2), makes it a crime for an individual to transport or attempt to transport within the United States an alien, whom the individual knows or has reasonable grounds to believe last entered the United States within three years prior to the transport. Thus, the statute has two components, transporting or attempting to transport an alien, and doing so with actual knowledge or reasonable grounds to believe that such alien has entered the United States within the last three years.[1] The government argues that the following three facts provided sufficient evidence for a conviction under section 1324(a)(2): (1) the extensive efforts of the defendants to avoid detection by immigration officials while transporting the aliens; (2) the exorbitant $300.00 fee charged to Ortiz for transportation from Houston to Florida; and (3) the fact that both Ortiz and Reyes carried only one suitcase for their journey from Houston to Florida. We agree that the evidence was sufficient as to the transportation component, however, we find that the government failed to make a sufficient showing that defendant either knew or had reasonable grounds to know that Ortiz and Reyes had entered the United States within the last three years. Our holding is based upon a review of the entire record with special scrutiny given to the testimony of the government's two key witnesses, Ortiz and Reyes.

First, there is no question that Ortiz and Reyes were illegal aliens and that Ruben and Damian Tapia were aware of their status as illegal aliens. However, it is not enough that the defendants knew that the aliens were illegally in the country; indeed, the defendants themselves were illegal aliens. The clear requirement under the statute is that the defendants knew or had reason to know that the aliens they were transporting had illegally entered the coun-

try within the last *three* years. 8 U.S.C. § 1324(a)(2). In this regard, our focus is on conversations and activities between the aliens and defendants that could have possibly conveyed to the defendants that the aliens had entered within the last three years. We find no such evidence of any conversations or activities relevant to proving the defendants' knowledge. For instance, though Ortiz told Ruben Tapia in Houston that he was from El Salvador and illegally in the country, he specifically stated at trial that he had never told Ruben Tapia how long he had been in Houston or the United States. Reyes claims to have mentioned his illegality in Alabama when the defendants were segregating the aliens among the different vehicles to go to Florida. He stated that he specifically mentioned to the appellant, Damian Tapia, that he was an illegal alien and should go to the van carrying the Mexicans and Salvadorans. However, there is absolutely no evidence that he ever indicated to Damian the length of time that he had been in the United States.

■ The other activities engaged in by Ruben and Damian Tapia, such as driving in the caravan late at night to avoid detection by Immigration officials demonstrates that the defendants were generally fearful of detection not only because of the presence of aliens they were transporting but also because of their own illegal status within the country. There is no evidence that their attempts to avoid detection were specifically related to their knowledge that they were carrying aliens who had entered the country within the last three years. We emphasize that it is not enough that the government prove that an individual has transported aliens whom he knows to be illegally in the country; rather, the statute imposes a requirement that the government prove that an individual transported illegal aliens knowing, or having reason to know, that they had entered the United

---

1. We can only speculate as to why the statute was drawn in this fashion as there is no clear legislative history. Such decisions rest with the legislative branch of government.

States within the last three years. We find no such evidence in this case.[2]

In reaching this decision we are cognizant of other cases under this statutory provision that have upheld convictions under somewhat similar facts. For instance, in *United States v. Bazan* 637 F.2d 363 (5th Cir.), *cert. denied,* 451 U.S. 993, 101 S.Ct. 2335, 68 L.Ed.2d 854 (1981), the individual aliens involved had crossed the Rio Grande River and walked to Concepcion, Texas, near the Mexican border, where they were employed for three weeks on a ranch. The defendant worked with the aliens during this time and later arranged for them to travel farther north to Arkansas. The court upheld the defendant's conviction under section 1324(a)(2) finding sufficient evidence to support a jury finding beyond a reasonable doubt that the defendant knew the aliens had just arrived in the country. *Bazan,* 637 F.2d at 367. Clearly the close proximity of the ranch to the border provided strong circumstantial evidence of the aliens' recent entry into the country. We find this case distinguishable from *Bazan* because Houston, unlike Concepcion, Texas, does not provide the necessary circumstantial evidence to infer knowledge of an alien's recent entry.

In *United States v. Fierros,* 692 F.2d 1291 (9th Cir.1982), *cert. denied,* 462 U.S. 1120, 103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983), the defendant had specifically requested and received workers from Oaxaca, Mexico. Though the workers were actually recruited in San Diego, California, the court found sufficient circumstantial evidence to convict under section 1324(a)(2) because the defendants had sought out and obtained workers from Mexico. *Id.* at 1296.

The clearest case establishing a violation of the statute is *United States v. Boerner,* 508 F.2d 1064 (5th Cir.), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2418, 44 L.Ed.2d 681 (1975), where the defendant was apprehended at a marina after having transported aliens from Nassau to the United States on a vessel owned by the defendant. In response to the defendant's claim that he had no knowledge that the Haitians were not lawfully entitled to enter the United States, the court responded:

> Evidence of the exorbitant price demanded for the aliens' passage, and the surreptitious manner in which they were loaded onto the vessel, crowded into its hold, unloaded at a place remote from United States Customs inspection, and concealed in the rear of the U-Haul truck, all activities in which Paul Boerner fully participated, provided ample support for an inference of guilty knowledge.

*Id.* at 1068. It can certainly be argued that the appellant in this case engaged in similar surreptitious activities. However, unlike the defendant in *Boerner,* the appellant here had no reasonable objective basis to know that the aliens had entered the country within the last three years.

The appellant, Damian Tapia, made a motion for judgment of acquittal at the end of the government's case. After the district court denied this motion, the appellant presented evidence on his own behalf. At the close of his own case the appellant failed to renew his motion for judgment of acquittal. It is well settled that the appellant's failure to renew his motion after presenting evidence on his own behalf "operates as a waiver of the motion for acquittal and forecloses any review of the sufficiency of the evidence except where a miscarriage of justice would result." *United States v. Robbins,* 623

2. Evidence that Ortiz was charged $300.00 for transportation does not aid the government in this instance. The government failed to link the transportation charge to any knowledge on the part of the defendants that the aliens had been in the country for less than three years. Likewise, the fact that the aliens carried only one suitcase apiece is insufficient to establish the length of time the aliens had been in the coun-

try, especially given the fact that the trip from Houston to Alabama involved twelve to thirteen people being carried in one van. Finally, we note that both defendants testified and that the government upon cross-examination failed to ask the defendants whether they had knowledge or reason to believe that the aliens had been in the country for less than three years.

F.2d 418, 420 (5th Cir.1980).[3] This standard has been interpreted to require a finding that "the evidence on a key element of the offense is so tenuous that a conviction would be shocking." *United States v. Landers,* 484 F.2d 93, 94 (5th Cir.1973) (footnote omitted), *cert. denied,* 415 U.S. 924, 94 S.Ct. 1428, 39 L.Ed.2d 480 (1974).

We find that the evidence introduced at trial established that the defendants knew the aliens were illegally in the country, but failed to establish any basis whatsoever that the defendants knew or had reason to believe that the aliens had been in the country for less than three years. Consequently, we hold that knowledge of an alien's illegal status, without more, provides insufficient evidence for a rational trier of fact to find guilt beyond a reasonable doubt.

The statute sets forth two essential elements in connection with the transportation charges. The evidence in the record supports only one of the two necessary elements. To uphold a conviction, in the absence of any evidence as to an essential element, would be a "miscarriage of justice."

REVERSED.

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.