[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 07-10480-GG

_____

D. C. Docket No. 06-20322-CR-CMA

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 26, 2010
JOHN LEY
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DIANA SOTTO,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(May 26, 2010)

Before PRYOR and FAY, Circuit Judges, and QUIST,[*] District Judge.

QUIST, District Judge:

Defendant, Diana Sotto (Sotto), appeals her convictions and sentences on three

counts: (1) conspiracy to defraud the United States and to pay and receive health care

_____

[*] Honorable Gordon J. Quist, United States District Judge for the Western District of
Michigan, sitting by designation.

kickbacks, in violation of 18 U.S.C. § 371 (Count I); (2) conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count II); and (3) conspiracy to launder money, in violation of 18 U.S.C. § 1956(h) (Count V). Soto raises ten issues on appeal. After review and oral argument, we affirm the convictions and sentences.

## I. BACKGROUND

Sotto owned and ran All Medical Billing Solutions (All Medical), a company that provided billing services to medical providers for Medicare and other health insurances. Project New Hope, (PNH), a medical clinic, was a client of All Medical. In September 2004, Luis Manuel Fernandez (Fernandez) and his wife, Maria Julia Loriga (Loriga), assumed control of PNH in connection with a purchase of the clinic financed, in part, by Sotto. At the time of the purchase Sotto, Fernandez, and Loriga had been good friends for about five years. Sotto was instrumental in facilitating Fernandez's and Loriga's involvement with PNH. In fact, although Sotto did not manage the daily affairs of the clinic, she and her cousin, Miguel Libera, "call[ed] the shots" for the business.

PNH's business changed substantially following the sale, both with regard to Medicare billings and the patient medical conditions. Prior to the sale, PNH had billed Medicare less than $26,000 and received slightly more than $10,000, while in the two weeks or so following the sale, PNH billed Medicare more than $262,000 and

2

received approximately $125,000. Prior to the sale, none of PNH's patients had AIDS, while after the sale all of PNH's patients were treated exclusively for AIDS.

Patients were given cash payments known as "candy," typically in the amount of $200, each time they went to the clinic, regardless of whether they received treatment. Manuel Ivan Perez recruited patients for the clinic. Beatriz Fernandez, the daughter of Fernandez and Loriga, worked as a receptionist and was in charge of getting patient signatures on blank superbills[1] that she then gave to Sandra Galvez, the clinic's nurse, to fill out. Galvez always completed the superbills, indicating that the patient had received treatment, even when the patient was not treated.

After Fernandez became involved with PNH, PNH billed Medicare for treatment of 45 individuals, all of whom had AIDS. In several instances, the quantities of prescription drugs for AIDS infusion therapy in PNH's bills far exceeded the quantities PNH actually purchased. For example, PNH billed for 1,183 vials of the drug Procrit but only purchased 74 vials. Similarly, in many instances, claims that Sotto submitted to Medicare were for quantities far in excess of what was shown on the treatment sheets and superbills that Galvez filled out and, in fact, were far in excess of the amount that could possibly be administered to an individual.

---

[1]A superbill is a billing form used by medical providers containing patient information and diagnostic codes for submission to Medicare/Medicaid and insurance companies.

Moreover, some of the drugs billed as administered to the patients are infrequently used to treat AIDS.

Sotto received 5% of all Medicare receipts as payment for her billing services, but in addition, she received substantial amounts from PNH in the form of checks made payable to sham corporations that Sotto owned or helped to form. One such corporation, Falcon Transport, was set up by Francisco Falcon at the request of his stepdaughter, Scarlet Duarte, and her friend, Sotto. Falcon Transport never conducted any business, and Falcon, himself, never used the entity for any purpose, business or otherwise; yet, Falcon Transport received checks from PNH totaling $158,597. Francisco Falcon was unaware of these checks, although Sotto did give him one check from Falcon Transport for $5,000. Records that Fernandez kept of payments by PNH showed a January 5, 2005, payment to Sotto of $61,425, that corresponded by date and amount with a check that PNH had written to Falcon Transport. Scarlet Duarte, a friend of Sotto and employee of All Medical, used Falcon Transport funds for personal expenditures and on several occasions asked acquaintances to cash checks written on Falcon Transport's account.

In September 2005 PNH ceased doing business, and a new company, Outreach Medical Center (OMC), began operating a clinic in the same building where PNH was located. Sotto formed OMC and identified Beatriz Fernandez as the owner on

4

the corporate documents. OMC essentially picked up business where PNH left off, with the same employees and same business practice of giving patients cash payments. OMC submitted $242,000 in claims to Medicare and was paid approximately $50,000.

Sotto and six other co-defendants were charged in a six-count superseding indictment with various health care fraud and money laundering offenses. Soto was charged with: (1) conspiracy to defraud the United States and to pay and receive health care kickbacks, in violation of 18 U.S.C. § 371 (Count I); (2) conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count II); and (3) conspiracy to launder money, in violation of 18 U.S.C. § 1956(h) (Count III). Prior to trial Sotto filed a motion to suppress all of the documents seized in a search of All Medical's offices on the grounds that the agents flagrantly disregarded the scope of the warrant. Following a hearing, the district court granted the motion with respect to the documents outside the scope of the warrant but denied the motion with regard to the PNH documents.

Five of the co-defendants pled guilty prior to trial, and Sotto and Sandra Galvez proceeded to trial. At the conclusion of the trial, the jury convicted Sotto and Galvez on all counts. The district court sentenced Sotto to 121 months.

Sotto then filed this timely appeal.

## II. DISCUSSION

On appeal Sotto argues that: (1) there was insufficient evidence to support Sotto's convictions on Counts I, II, and V; (2) the district court erred in denying Sotto's motion to suppress all of the documents seized during the search of All Medical; (3) the district court erred in denying Sotto's motion to dismiss Count II as multiplicitous; (4) the district court abused its discretion when it admitted Rule 404(b) evidence of uncharged bad acts committed by Sotto, including previously uncharged conduct of money laundering for a medical clinic; (5) the district court abused its discretion by admitting prejudicial hearsay and double hearsay statements by Beatriz Fernandez regarding a conversation between her father and an unknown male; (6) the admission of hearsay statements by Beatriz Fernandez regarding statements by her father and an unknown male violated the Confrontation Clause; (7) the cumulative effect of the district court's evidentiary errors influenced the outcome of the trial; (8) the district court erred by applying U.S.S.G. § 2S1.1(a)(2) to the amount of money Sotto laundered; and (9) the district court erred by adding a two-level enhancement for sophisticated means pursuant to U.S.S.G. 2S1.1(b)(3). We review these arguments in turn.

### A. Sufficiency of the Evidence

#### 1. Counts I and II

The district court denied Sotto's Rule 29 motion for judgment of acquittal. We review the denial of a motion for judgment of acquittal *de novo*. See United States v. Hansen, 262 F.3d 1217, 1236 (11th Cir. 2001). "An appellate court must view the evidence in the light most favorable to the government, drawing all reasonable inferences and credibility determinations in favor of the verdict." United States v. Simpson, 228 F.3d 1294, 1299 (11th Cir. 2000) (citation omitted).

In Count I, Sotto was charged with conspiracy under 18 U.S.C. § 371 to defraud the United States and violate 42 U.S.C. § 1320(a)-7b(b)(2)(B) by paying kickbacks to Medicare patients. The elements of a conspiracy under § 371 include (1) an agreement among two or more people to achieve an unlawful objective, (2) the defendant's knowing and voluntary participation in the agreement, and (3) an overt act by a conspirator in furtherance of the agreement. See United States v. Adkinson, 158 F.3d 1147, 1153 (11th Cir. 1998). In Count II, Sotto was charged with participating in a conspiracy, in violation of 18 U.S.C. § 1349, to execute a scheme to defraud the Medicare program, which is a violation of 18 U.S.C. § 1347.

The government presented a plethora of evidence supporting Sotto's convictions. Sotto fronted half of the money to purchase PNH from its previous owner and remained part owner of PNH while she worked closely with Fernandez. Fernandez and Loriga had no medical training or experience prior to purchasing PNH

7

but managed to bill Medicare $262,000 in their first sixteen days of operations, and $10 million in their first year, while the previous owner billed Medicare for less than $26,000 in five months of operations. Sotto furthered the fraud by inflating Medicare claims for expenses above the amounts listed on PNH's superbills. Moreover, in an undercover tape recording, Sotto told Lori Sanchez, an employee of All Medical whose husband was the corporate officer for one of Sotto's sham corporations, that PNH paid kickbacks to patients and that Sotto was behind the whole scheme.

Sotto's role did not stop at this. Sotto also set up several sham companies, including Dade County Medical Consulting, Medical Consultants of Miami, and Seapointe Investments, through which Sotto cashed checks, evidenced by the ledger found in the search of Fernandez's home. Finally, Sotto prepared false invoices to cover the money Sotto received from Unified Transport. Therefore, the government presented more than sufficient evidence to convict Sotto of Counts I and II.

### 2. Count V

Sotto waived her right to challenge the sufficiency of the evidence supporting the jury's guilty verdict on Count V. In her Rule 29 motion, Sotto's counsel stated, "With respect to [Count V], I must honestly concede that in the light most favorable to the Government, they have put forth sufficient evidence that I think a reasonable and prudent jury could find the defendant guilty of that, so I'll waive [Count V]."

8

(Tr. of Jury Trial Proceedings, docket no. 340, at 4.) Sotto thus failed to move for judgment of acquittal on Count V at the close of evidence, which "'operates as a waiver of the motion for acquittal and forecloses any review of the sufficiency of the evidence except where a miscarriage of justice would result.'" United States v. Hernandez, No. 08-17207, 2010 WL 125847, at *4 (11th Cir. Jan. 14, 2010) (citing United States v. Tapia, 761 F.2d 1488, 1491-92 (11th Cir. 1985)). A miscarriage of justice results where "the evidence on a key element of the offense is so tenuous that a conviction would be shocking." Tapia, 761 F.2d at 1492 (citation and quotations omitted).

In Count V, Sotto was charged with conspiring to (1) conduct or attempting to conduct a financial transaction, (2) knowing that the property involved represented the proceeds of some form of unlawful activity, (3) where the property was in fact the proceeds of an unlawful activity, and either (i) intending to promote the carrying on of the specified unlawful activity, or (ii) knowing that the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity, all in violation of 18 U.S.C. § 1956(h).

Sotto has not shown that the evidence on a key element of her conviction is so tenuous that a conviction would be shocking and cause a miscarriage of justice. Indeed, as Sotto stated in her Rule 29 motion, "The Government put on plenty of

9

evidence . . . . They [the government] went through Scarlet Duarte, the bank accounts. . . . They went through all the companies, every single one of those companies, charts, everything went toward the money laundering counts." (Tr. of Jury Trial Proceedings, docket no. 340, at 6.) There was overwhelming evidence to convict Sotto of Count V.

### B.     Motion to Suppress

"Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts *de novo*. Further, when considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the prevailing party below." United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000) (citation omitted).

"The Fourth Amendment requires that a warrant particularly describe the place to be searched and the terms or person to be seized; exploratory rummaging is prohibited." United States v. Jenkins, 901 F.2d 1075, 1081 (11th Cir. 1990). Generally, when law enforcement officers conduct a search that exceeds the proper scope of a warrant, evidence obtained in that search may be excluded. United States v. Henderson, 234 F.3d 494, 497 (11th Cir. 2000) (citing Horton v. California, 496 U.S. 128, 140, 110 S. Ct. 2301, 2310 (1990)). "Only the evidence seized while the

10

police are acting outside of the boundaries of the warrant is subject to suppression." Id. Evidence that is properly within the scope of the warrant will be suppressed only where there has been a "flagrant disregard" of the terms of the warrant. United States v. Waugneux, 683 F.2d 1343, 1354 (11th Cir. 1982).

Sotto argued in her motion to suppress that all documents obtained in the search of All Medical should be suppressed because by seizing documents for medical clinics other than PNH, the agents deliberately and flagrantly exceeded the scope of the warrant. The district court concluded that the agents did not use the warrant as "pretext" for a general search, largely due to the nature of the search and the manner in which the records were maintained in All Medical's offices. The district court also noted that the incriminating nature of the non-PNH documents – disclosing evidence of similar AIDS infusion therapy schemes by other clinics – was immediately apparent to the supervising agent in charge of the search. While the district court agreed that the majority of the documents seized were outside the scope of the warrant, it concluded that suppression of the PNH documents was unwarranted.

FBI Special Agent Huy Nguyen, the case agent in charge of the investigation of Sotto and the other defendants, testified on behalf of the government at the suppression hearing. At the time of the hearing Agent Nguyen had been investigating health care fraud for about two years and had received training from medical

professionals concerning indicators of health care fraud, particularly with regard to AIDS infusion therapy. Agent Nguyen learned that AIDS infusion therapy is generally medically necessary only for AIDS patients who are hospitalized and that Medicare had deemed billings for Neupogen and Procrit – the two most common drugs used in AIDS infusion therapy – as prone to fraud. Agent Nguyen also knew that OMC began billing Medicare for AIDS infusion therapy shortly after PNH ceased operations, that OMC employed the same personnel as PNH, and that OMC had paid a kickback to at least one patient. Agent Nguyen explained that he, or his agents, had to briefly examine all of the records to determine whether they obtained anything relevant to the search. Some documents were in file cabinets labeled only with a letter range, such as M-Z, while others were lying on counter tops, in cubby holes, or scattered throughout the office. The agents found documents for OMC, a company named New Hope Medical Center, and other companies, all of which billed for AIDS infusion therapy and had superbills showing AIDS infusion therapy on a frequency indicating fraud. Some of these documents disclosed the names of beneficiaries known to have received kickbacks at other clinics. Given his training and experience, Agent Nguyen deemed these document to be evidence of Medicare fraud. Although Agent Nguyen interpreted the warrant as authorizing the seizure of any billing records associated with All Medical, he took only those records relating

12

to AIDS infusion therapy.

Nothing in the record suggests that the agents flagrantly disregarded the scope of the warrant. Rather, in reviewing all of the documents, as required by the nature of the search, the agents reasonably concluded that the disputed documents contained evidence of the same type of criminal activity covered by the warrant. The agents took only those documents believed to be related to the purpose of the search. We find no error in the district court's conclusion.

## C.     Multiplicity of Counts I and II

Sotto next argues that the district court erred in denying her motion to dismiss either Count I or Count II as multiplicitous. While we ordinarily review *de novo* whether counts in an indictment are multiplicitous, United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000), Sotto failed to raise her multiplicity challenge before trial. Our cases hold that when a defendant fails to object to multiplicitous counts prior to trial, she is procedurally barred from challenging her convictions. United States v. Mastrangelo, 733 F.3d 793, 800 (11th Cir. 1984); Fed. R. Crim. P. 12(b). Sotto thus waived any objection with regard to any alleged error in the indictment. Id.[2]

[2]While Sotto is barred from objecting to her convictions, she is not barred from challenging her separate sentences. *United States v. Grinkiewicz*, 873 F.2d 253, 255 (11th Cir. 1989). Although Sotto does not challenge her separate sentences on appeal, any error would be harmless, because Sotto received concurrent sentences on the counts she claims were multiplicitous. United States v. Langford, 946 F.2d 798, 804-05 (11th Cir. 1991) (noting that "the principal danger in a multiplicitous indictment . . . that the defendant may receive multiple sentences for a single offense" is not a concern where "the sentences for multiplicitous counts run concurrently").

**D.    Evidentiary Issues**

**1.    Confrontation Clause**

Sotto argues that Beatriz Fernandez's testimony about a conversation Beatriz overheard between her father, Fernandez, and an unknown male violates the Confrontation Clause.  During this conversation, Fernandez said that he did not call the shots at PNH, but that Sotto and her cousin, Miguel Libera, called the shots. Fernandez's statement is not testimonial in nature because the statement regarding Sotto's role at PNH was made in the dining room of Fernandez's house with no expectation that the statement would be repeated at any trial.  Cf. United States v. Underwood, 446 F.3d 1340, 1347 (11th Cir. 2006) (noting that the class of "testimonial" statements includes a statement made under circumstances which would lead the declarant to reasonably believe the statement would be available for use at a later trial).

In any event, Sotto failed to object to the admissibility of Beatriz's testimony. We therefore review the admission of this testimony for plain error.  Fed. R. Crim. P. 52(b). Cf. United States v. Jernigan, 341 F.3d 1273, 1289 (11th Cir. 2003) (applying plain error review where defendant failed to object to the admission of a testimonial statement to a police officer).  For a judgment to be reversed for plain error, "(1) a legal error must have been committed; (2) that error must be plain; and (3) the error

14

must have affected the substantial rights of the appellant." United States v. Pielago, 135 F.3d 703, 708 (11th Cir. 1998).

Assuming for the sake of argument that the admission of Beatriz's testimony was legal error, the overwhelming evidence of Sotto's involvement in the PNH fraud ensured that Sotto's substantial rights were not affected. Therefore, Sotto's Confrontation Clause argument lacks merit.

### 2. Other Evidentiary Issues

Sotto's other evidentiary issues also lack merit. Sotto argues for the first time on appeal that the district court erred in admitting (1) evidence of her prior uncharged conduct in money laundering for another medical clinic, and (2) the allegedly hearsay testimony of Beatriz Fernandez that she heard her father tell someone that Sotto and her cousin called the shots at PNH. Sotto further contends that the cumulative error of these evidentiary rulings influenced the outcome of her trial.

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation omitted). When addressing a claim of cumulative error we must examine the trial as a whole to determine whether the defendant was afforded a fundamentally fair trial. United

States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997).

Even assuming that the district court erred in admitting both pieces of evidence, Sotto's substantial rights were not affected. As discussed above, in an undercover tape recording, Sotto told Sanchez that PNH paid kickbacks to patients and that Sotto was behind the whole scheme. Sotto furthered the fraud by inflating Medicare claims for expenses above the amounts listed on PNH's superbills. Sotto also set up several sham companies through which Sotto cashed checks, evidenced by the ledger found in the search of Fernandez's home. Finally, Sotto prepared false invoices to cover the money Sotto received from Unified Transport. No alleged error, alone or cumulatively, resulted in a fundamentally unfair trial.

## E. Sentencing Issues

Sotto raises two sentencing issues. First, she argues that the district court erred in relying upon subsection (a)(2), rather than (a)(1), of U.S.S.G. § 2S1.1 (the money laundering guideline) in calculating her base offense level, thereby rendering her sentences procedurally unreasonable. Second, she argues that the district court plainly erred by applying a two-level enhancement for "sophisticated laundering," pursuant to U.S.S.G. § 2S1.1(b)(3).

With respect to guideline issues, we review "purely legal questions *de novo*, a district court's factual findings for clear error, and, in most cases, a district court's

application of the guidelines to the facts with 'due deference.'" United States v. Rodriguez-Lopez, 363 F.3d 1134, 1136-37 (11th Cir. 2004).  When reviewing a district court's application of a guidelines provision to the facts, we have held that "due deference" is tantamount to clear-error review.  See United States v. White, 335 F.3d 1314, 1318-19 (11th Cir. 2003).  For a finding to be clearly erroneous, we "must be left with a definite and firm conviction that a mistake has been committed." Rodriguez-Lopez, 363 F.3d at 1137 (internal quotation marks omitted).

### 1.    The Money Laundering Guideline

A defendant convicted of a money-laundering offense is sentenced pursuant to U.S.S.G. § 2S1.1.  Under this guideline, a defendant who did not commit the underlying offense from which the laundered money derived, or for whom the base offense level of the underlying offense cannot be determined, is given a base offense level of eight plus the number of offense levels in the U.S.S.G. § 2B1.1 loss table that correspond to the value of the laundered funds.  U.S.S.G. § 2S1.1(a)(2).  On the other hand, when a defendant committed the underlying offense and the base level for that offense can be determined, a defendant is given the base offense level for that underlying offense.  U.S.S.G. § 2S1.1(a)(1).

The relevant commentary indicates that:

In order for subsection (a)(1) to apply, the defendant must have committed the underlying offense or be accountable for the underlying

17

offense under § 1B1.3(a)(1)(A). The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the underlying offense.

U.S.S.G. § 2S1.1, cmt. n.2(B).

Subsection (a)(2) applies to any case in which (i) the defendant did not commit the underlying offense; or (ii) the defendant committed the underlying offense (or would be accountable for the underlying offense under § 1B1.3(a)(1)(A)), but the offense level for the underlying offense is impossible or impracticable to determine.

U.S.S.G. § 2S1.1, cmt. n.3(A).

Sotto argued to the district court that the entire amount of the loss should not be attributed to her because there was insufficient proof that she had been involved in the Medicare fraud conspiracy from the beginning or that the entire amount of the loss was reasonably foreseeable to her. The government argued that Sotto should be held responsible for the entire loss, but that if the district court determined she should not be held responsible for the full amount, the amount of the loss attributable to her could not be determined and she should be sentenced under subsection (a)(2) based on the amount of funds she laundered.

In adopting the government's reasoning with regard to whether (a)(1) or (a)(2) of U.S.S.G. § 2S1.1 applies, the district court determined that the amount of overall Medicare fraud attributable to Sotto from the underlying offense could not be

determined and rejected Sotto's argument that the amount of loss attributable to her was the amount of money she laundered. Therefore, as the amount of loss could not be determined, Sotto's base offense level for the underlying offense of Medicare fraud could not be determined. *See* U.S.S.G. § 2B1.1(a), (b). Because the base offense level for Medicare fraud could not be determined, subsection (a)(1) was inapplicable to Sotto's case.

Accordingly, the district court properly applied subsection (a)(2) and determined Sotto's base offense level to be 22.

### 2. Sophisticated Laundering Enhancement

"[W]aiver is the intentional relinquishment or abandonment of a known right." United States v. Olano, 507 U.S. 725, 733, 113 S. Ct. 1770, 1777 (1993) (internal quotation marks omitted); see also United States v. Lewis, 492 F.3d 1219, 1222 (11th Cir. 2007) (en banc). We are barred from reviewing waived arguments. See Olano, 507 U.S. at 732–33, 113 S. Ct. at 1777. Sotto waived or abandoned her argument regarding the "sophisticated laundering" enhancement for money laundering before the district court. Accordingly, we affirm.

### III. Conclusion

Sotto's convictions and sentences are **AFFIRMED**.