[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 96-4405

_____

D. C. Docket No. 95-438-CR-NESBITT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EVANGELIO DIAZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 14, 1998)**

Before DUBINA and BARKETT, Circuit Judges, and GODBOLD,
Senior Circuit Judge.

DUBINA, Circuit Judge:

Appellant Evangelio Diaz ("Diaz") and co-defendant Anibal Quiles ("Quiles") were charged by a federal grand jury in the Southern District of Florida with conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (Count I); possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1)(Count II); and distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1)(Count III). After a trial by jury, Diaz was convicted of all three counts.[1] Diaz was sentenced to three concurrent terms of 121 months of imprisonment and concurrent five-year terms of supervised release. He then perfected this appeal, which presents the issue of whether the district court improperly participated in plea negotiations, in violation of Fed. R. Crim. P. 11(e).

## I. BACKGROUND FACTS

In 1993, federal and state law enforcement agencies began an operation in South Florida called "Hard Rock." The purpose of the operation was to alleviate inner city drug trafficking. While acting in an undercover capacity, Special Drug Enforcement Agency ("DEA") Agent Eric Williams ("Williams") met Diaz and two confidential informants ("CI #1") and ("CI #2"), at Bavarian Auto Parts in Miami to discuss the purchase of three ounces of crack cocaine. Agent Williams overheard Diaz tell CI #1 that the crack cocaine would arrive shortly. When Agent Williams asked CI #1 why Diaz had rushed them to the location when the cocaine was not

---

[1] Quiles pled guilty to Count III and is not involved in this appeal.

ready, Diaz replied "What he [CI #1] is not telling you, man, is that I had it, I had it . . . since last week, and you all are late." (1SR1:19). Agent Williams then observed Quiles leaving the scene after speaking with Diaz. Diaz told Agent Williams that Quiles had gone to get the cocaine.

A short time later Quiles returned to the used car lot. He motioned Williams, Diaz, and CI #1 inside the office. Once inside, Williams observed Quiles holding three small clear plastic bags containing what appeared to be powder cocaine. Quiles attempted to give the bags to Agent Williams who told Quiles that the product looked good but was not crack cocaine and that he did not know how to cook it.

Diaz then interjected and said, "Don't worry about that, I will cook it for you." (1SR1:24). Agent Williams and CI #2 then left the scene to get some food, while Diaz and CI #1 went to "cook" the powder cocaine.

When Agent Williams and CI #2 returned, Quiles told them to be patient and wait for Diaz who was bringing the package back. Later, CI #1 called Williams and told him that Diaz was having the cocaine powder cooked into crack cocaine and they would be returning shortly.

When Diaz returned, he showed Agent Williams rock-like substances contained in aluminum foil wrapping. Agent Williams remarked that the crack cocaine looked ugly, but Diaz insisted it was of good quality. CI #1 told Agent Williams that the package

3

really was crack cocaine because he had observed Diaz and his friends processing it.

Agent Williams gave Diaz $2,250 in cash. Diaz apologized for taking so long to complete the deal and promised that next time things would run more smoothly. Agent Williams and the two informants left the scene with the crack cocaine. Later, Diaz and Quiles were arrested. According to laboratory analysis, the substance given to Agent Williams by Diaz contained 62.8 grams of 86% pure cocaine base.

On the day that Diaz and Quiles appeared before the district court for trial, Quiles' lawyer advised the court that Quiles intended to plead guilty, although there was no plea agreement. At that point, the court asked that Diaz and his lawyer be brought into the courtroom. The district court then asked the prosecutor for information about the facts of the case, and the prosecutor summarized the government's evidence.

The district court inquired as to the penalties for both defendants under the sentencing guidelines, as well as any mandatory statutory penalties, and the prosecutor responded that they each faced a ten-year minimum mandatory prison term. The district court also inquired about the defendants' prior records and spent some time determining the exact nature and extent of Diaz's previous convictions for the purpose of ascertaining his criminal history category.

The district court then asked, "If Mr. Diaz goes to trial, is Mr. Quiles going to testify against him?" (1SR1:15). [2] The prosecutor responded that while Quiles was willing to testify, a decision had not been made as to whether he would. Additionally, the prosecutor stated that the undercover officer could provide the same testimony and that his testimony would be corroborated by two surveillance agents who saw the transaction, as well as by a videotape. The district court remarked, "That's a lot of evidence." (1SR1:16). Diaz's attorney informed the court that Diaz would probably enter into plea negotiations with the government if the government would agree to stipulate that the controlled substance involved in the offense was six ounces of powder cocaine. The prosecutor then asked the district court to give the parties fifteen minutes in the hope that the whole case could be resolved. In response, the district court said the following:

> THE COURT: Okay. Because I think that, see, Mr. Diaz, with all of this, I'm glad to go to trial here, I've got the jurors outside, we're going to trial. There's no problem about that.
>
> But you need to think about you, because if this is a one-day or two-day trial, and you're going to risk ten years in prison, you need to think about your options. You know, I'll be glad to sit here, we're glad to try your case, but when all of this evidence is going to be introduced by agents and undercover conversations with you and videotapes, the evidence is kind of compelling. The only hangup is this crack or powder cocaine issue, really.
>
> All right. We will be in recess until 11:00.

---

[2] Quiles' contention was that Diaz alone was responsible for converting the powder into crack cocaine. (1SR1:12, 14-15).

(1SR1:18).

At 11:30 a.m., the parties returned and the prosecutor stated that she had not been able to determine whether her office would accept a plea of guilty with the stipulation that the substance was powder cocaine but she would find out after the lunch hour. The district court stated that it was unlikely that such a plea would be acceptable to the government because "it would be contrary to their general guidelines. If somebody was there cooking crack, they're not going to let you plead to powder." (1SR1:20). The district court then gave the defendants the option of pleading guilty or going to trial. The court advised the defendants that the question of whether the cocaine was crack or powder was a sentencing issue. Quiles pled guilty to Count III of the indictment. Diaz exercised his right to go to trial and was convicted on all three counts of the indictment.

The court found that Diaz was responsible for a drug offense involving 62.8 grams of crack cocaine. Under the sentencing guidelines, the applicable sentencing range for that amount of crack cocaine was 121 to 151 months imprisonment. U.S.S.G. §§ 2D1.1(a)(3), 5A (Sentencing Table) (Nov. 1995). The court sentenced Diaz to 121 months, the lowest possible sentence within the guidelines range, stating "I am not punishing the defendant because he went to trial." (R4:20).

Diaz argued for a lower sentence on several grounds, all of which were rejected by the district court. First, he asserted that he was responsible for 84 grams of powder cocaine rather than 62.8

6

grams of crack cocaine.  Second, he argued that he was entitled to a reduction in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1.  Third, he claimed that he was entitled to a two point reduction in his offense level pursuant to the safety valve provision of 18 U.S.C. § 3553(f).

## II.  <u>STANDARD OF REVIEW</u>

A violation of Fed. R. Crim. P. 11(e)(1) is plain error and, pursuant to its supervisory power over the district courts, the court of appeals may raise such a violation <u>sua sponte</u> and order a resentencing of a defendant who pleads not guilty and demonstrates no actual prejudice in his trial or sentence.  <u>United States v. Adams</u>, 634 F.2d 830, 831-32 (5th Cir. Unit A Jan. 1981).[3]

## III.  <u>DISCUSSION</u>

Diaz contends that the district court violated Fed.R.Crim.P. 11 when it announced that the United States Attorney's office would not approve a guilty plea that involved a stipulation that Diaz possessed crack cocaine.  He also argues that he was prejudiced at sentencing because the district court's participation in the plea negotiation process prevented him from accepting responsibility, apparently for possessing powder cocaine, which he was prepared to do but for the court's interference.

---

[3]     In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

Fed. R. Crim. P. 11(e)(1) provides as follows:

> The attorney for the government and the attorney for the defendant . . . may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty . . ., the attorney for the government will [dismiss charges, agree to recommend or not oppose a request for a particular sentence, or agree that a specific sentence is appropriate]. <u>The court shall not participate in any discussions</u>.

(Emphasis added). Rule 11's prohibition on court participation in plea negotiations is designed to entirely eliminate judicial pressure from the plea bargaining process. <u>United States v. Casallas</u>, 59 F.3d 1173, 1178 (11 th Cir. 1995); <u>United States v. Corbitt</u>, 996 F.2d 1132, 1135 (11th Cir. 1993).

The district court's role under Rule 11 is to evaluate a plea agreement once it has been reached by the parties and disclosed in open court. <u>Adams</u>, 634 F.2d at 835. Prior to that time, a court should not offer comments touching upon proposed or possible plea agreements because "[s]tatements and suggestions by the judge are not just one more source of information to plea negotiators; they are indications of what the judge will accept, and one can only assume that they will quickly become 'the focal point of further discussions.'" <u>Id.</u> (quoting <u>United States v. Werker</u>, 535 F.2d 198, 203 (2d Cir. 1976)). Furthermore, "[t]he purpose and meaning of this prohibition are that 'the sentencing judge should take no part whatever in any discussion or communication regarding the sentence to be imposed prior to the entry of a plea of guilty or conviction, or submission to him of a plea agreement.'" <u>Corbitt</u>, 996 F.2d at 1134 (quoting <u>Werker</u>, 535 F.2d at 201).

8

In the present case, because the sentencing judge took an active part in discussing Diaz's probable sentence before the time of his conviction and because she commented on the weight and nature of the evidence against him, we hold that the court violated Rule 11(e)(1). Pursuant to our supervisory power over the district courts, we must determine the appropriate remedy, if any, for this violation of Rule 11. See Adams, 634 F.2d at 831. Diaz has requested a new trial before a different district judge or, alternatively, resentencing before another judge. For the reasons detailed below, we conclude that the district judge's participation in plea negotiations did not compromise her neutrality and did not prejudice Diaz, and therefore we hold that he is entitled to no relief.

The primary purpose of Rule 11(e)(1) is to avoid the danger of an involuntary guilty plea coerced by judicial intervention. Corbitt, 996 F.2d at 1134 (citing Brown v. Peyton, 435 F.2d 1352 (4th Cir. 1970)). A defendant may be motivated to enter an involuntary guilty plea if he fears that his "rejection of the plea will mean imposition of a more severe sentence after trial or decrease his chances of obtaining a fair trial before a judge whom he has challenged." Id.

However, this case does not raise the specter of an involuntary plea. Indeed, far from being coerced to plead guilty because a higher sentence was threatened after trial, Diaz chose to stand trial where he was convicted on all three counts against him. Significantly, he does not present any errors in this appeal

regarding his trial, nor does he claim that his guilt was not clearly determined.  Consequently, a new trial is unwarranted. See Adams, 634 F.2d. at 831-32 (holding that defendant who demonstrates no actual prejudice in his trial was not entitled to new trial despite trial court's violation of Rule 11).  Diaz's general complaint is that he was prejudiced when the court terminated negotiations by stating that the United States Attorney's Office would not approve a plea of guilty by Diaz to an offense involving powder cocaine.  This contention is simply without any foundation in the record.

Diaz, who was represented by counsel, could have asked the district court not to proceed with the trial until after the lunch break, in order to give the prosecutor a chance to determine whether she had the authority to accept the proposed plea.  This was not done.  Moreover, we agree with the district court that the government could not enter into a proposed plea agreement which would necessarily involve a stipulation by the government that the offense involved powder cocaine.  Because the evidence in the case overwhelmingly demonstrated that Diaz had in fact negotiated for and delivered crack cocaine, a plea involving a stipulation by the government that the offense involved powder cocaine would have been patently improper.  See U.S.S.G. § 6B1.4 (stipulation shall not contain misleading facts).

Diaz has not made any showing that, but for the court's alleged interference, he would have been offered such a plea. Without this showing, his claim of prejudice is baseless.

10

Furthermore, a stipulation between the parties that the offense involved powder cocaine would not be binding on the district court which remains free to determine the facts from the Presentence Investigation Report ("PSI") and sentence Diaz accordingly. See U.S.S.G. § 6B1.4(d).

Although Diaz has requested resentencing by another district judge, he has not specifically pointed to any evidence that the sentencing judge was biased against him or that his sentence would be different if determined by another judge. Diaz presented no evidence, either at trial or at his sentencing hearing, pertaining to the form or amount of cocaine he agreed to provide and did provide to Agent Williams. As a result, all of the direct evidence in the record indicates that Diaz was guilty of conspiring to possess and distribute 62.8 grams of crack cocaine. The district court correctly found by a preponderance of the evidence that Diaz negotiated to sell crack cocaine, that he was personally involved in cooking the cocaine, and that the amount of crack he gave to Agent Williams was 62.8 grams.

Moreover, Diaz has failed to demonstrate his entitlement to any downward adjustments in his base offense level. Although the district court denied a downward adjustment for acceptance of responsibility, the court obviously did not prevent Diaz from accepting responsibility. Diaz expressed remorse at his sentencing hearing, but he never admitted that he conspired to deal in crack cocaine, as opposed to powder cocaine. The sentencing guidelines indicate that a defendant who denies relevant conduct which the

11

court finds to be true has acted in a manner inconsistent with the acceptance of responsibility. U.S.S.G. § 3E1.1 comment. (n.1(a)). The fact that Diaz never provided the government with complete and truthful information about his offenses also precluded the court from applying the safety valve provisions of 18 U.S.C. § 3553(f). In short, we see no error in the sentence imposed on Diaz. The district judge's factual findings are abundantly supported by the record, and her interpretation of the sentencing guidelines is correct.

In Adams, the former Fifth Circuit faced the question of how to remedy violations of Rule 11(e)(1) in cases where the defendant pleads not guilty and demonstrates no actual prejudice in his trial and sentencing. The court determined that a new trial was not appropriate under such circumstances, but remanded the case for resentencing before a different judge because the limited sentencing record made it difficult to determine whether or not the sentencing was impartial. Id. at 842-43.

However, the remedy employed in Adams is unnecessary in this case for several reasons. First, Adams was decided before the enactment of the sentencing guidelines, and in pre-guidelines practice, "[s]entencing hearings [were] relatively short and typically involve[d] no detailed record and no rulings by the court other than the sentencing itself." Adams, 634 F.2d at 842. In fact, in Adams, two relevant conversations with the judge were held off the record. 634 F.2nd at 832, n.1, 833. Under the sentencing guidelines, the sentencing judge operates with significantly less

12

discretion, and during an adversarial hearing, a complete and detailed record of the justifications behind a sentence is created for appellate review. Second, in Adams, the district judge apparently rejected a proposed plea agreement because she had committed to imposing a particular sentence if the defendant pled guilty, and she subsequently came to believe that her promised sentence was too lenient. See id. at 832-34. Thus, her ability to fairly and impartially sentence the defendant was called into question. Id. at 836. In the present case, the district judge did not enter into any compromising bargains with respect to potential sentences, but merely engaged in a straight-forward discussion of the applicable guidelines in open court. Third, and most importantly, the district court based Diaz's sentence on entirely sound reasons and displayed no bias in sentencing him. He was given the minimum sentence available upon the facts as properly found by the court.

In conclusion, based on the evidence of record, we conclude that Diaz is entitled to no relief. Accordingly, we affirm his convictions and sentences.

AFFIRMED.

13