[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15680

_____

D.C. Docket No. 1:10-cr-20800-JLK-4

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DERRICK HARRELL,
CORWIN DANTZLE,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(May 14, 2014)

Before PRYOR, JORDAN, and FAY, Circuit Judges.

JORDAN, Circuit Judge:

Derrick Harrell and Corwin Dantzle appeal from their convictions for

conspiracy to commit robbery and two counts of robbery (one of a Walgreens, the

other of a McDonald's), both in violation of the Hobbs Act, 18 U.S.C. § 1951(a),

and for two counts of having used, carried, or possessed a firearm in relation to the robberies, in violation of 18 U.S.C. § 924(c)(1)(A).

Mr. Harrell pleaded guilty to the charges and received an agreed-upon sentence of 25 years' imprisonment. He argues for the first time on appeal that the district court impermissibly participated in the parties' plea negotiations in violation of Federal Rule of Criminal Procedure 11(c)(1) and failed to comply with the requirements of Rule 11 governing the acceptance of his guilty plea.

Mr. Dantzle, who was convicted after a jury trial and sentenced to 401 months in custody, raises four arguments on appeal. He contends that there was insufficient evidence to convict him of the firearms offenses; that the district court erred in admitting, as expert opinion testimony, cell tower and cell phone location evidence; that the prosecutor's statements in closing argument constituted reversible error; and that his consecutive terms of imprisonment for the firearms offenses violate his due process and equal protection rights, constitute cruel and unusual punishment, and are unreasonable.

We address Mr. Harrell's arguments first and then proceed to Mr. Dantzle's.

## I

Mr. Harrell argues that the district court violated Rule 11(c)(1) when it became impermissibly involved in the parties' plea negotiations. Mr. Harrell did not raise this objection below, so our review is for plain error. *See United States v.*

2

*Vonn*, 535 U.S. 55, 62 (2002).    This means that Mr. Harrell must show that the district court committed an error, that the error was plain, that the error affected his substantial rights, and that the error "seriously affected the fairness, integrity or public reputation of the judicial proceedings." *See id; United States v. Marcus*, 560 U.S. 258, 262 (2010).    The Supreme Court has explained that, in determining whether a Rule 11(c)(1) error has affected a defendant's substantial rights, a reviewing court should consider "whether it was reasonably probable that, but for the [district court's] exhortations, [the defendant] would have exercised his right to go to trial."  *United States v. Davila*, 133 S. Ct. 2139, 2150 (2013).

## A

In making the plain error determination, we examine the entire record.  *See id.; United States v. Dominguez Benitez*, 542 U.S. 74, 83-84 (2004).  We begin, therefore, with what happened in the district court.

On the morning of the first day scheduled in the joint trial of Mr. Harrell and Mr. Dantzle, and prior to bringing the jury venire into the courtroom, the district court stated that "it might be worth spending a few minutes in terms of the overall gravity of the situation to discuss whether or not there is some possibility of a plea or pleas of the two defendants."  The district court then engaged defense counsel for Mr. Harrell, defense counsel for Mr. Dantzle, and the prosecutor in a lengthy discussion regarding the likelihood of a plea from either or both of the defendants.

3

The district court first made comments generally applicable to both Mr. Harrell and Mr. Dantzle. For example, the district court said that there were "four, very serious charges brought against the defendants;" that the potential sentencing guideline recommendation "will be or is extraordinarily high;" and that its "ability to fashion some sort of sentence that is fair and reasonable is limited to some extent" under the Sentencing Guidelines after trial; and that it had "more latitude if it is before a conviction."

The district court then addressed Mr. Dantzle and his attorney and contrasted the 32-year sentence that Mr. Dantzle faced if convicted at trial with the seven-year sentence he would receive if he pleaded guilty: "The young man is facing, if convicted, 32 years in jail. The other way, seven years. It's a tremendous decision." When Mr. Dantzle later stated that he wanted to exercise his right to go to trial, the district court commented that "Mr. Dantzle's decision is so far removed from logical, intelligent consideration that I have a doubt about his mental ability and mental capabilities." Mr. Harrell, who was facing the same charges as Mr. Dantzle, was present during the entirety of the district court's discussions with Mr. Dantzle and his attorney.

Before the district court addressed Mr. Harrell's situation, it told the parties that "I usually don't do what you see me doing here today[,]"that "[the prosecutor]

knows I don't do this," and that "I'm doing something that I don't usually do. Basically, I'm doing it for the benefit of the defendants."

The prosecutor next explained that, although Mr. Harrell's attorney had been trying diligently to reach a plea agreement similar to that of other co-defendants, the government was unwilling to offer him anything less than the mandatory minimum, which would be at least 32 years.  The prosecutor said that the government could not treat Mr. Harrell the same as his co-defendants because it was aware of things he had done in the community and because there were certain state court matters which led the government to believe that Mr. Harrell was not similarly situated. Later during these same discussions, Mr. Harrell's attorney indicated that Mr. Harrell had very serious charges, involving murder and attempted murder, pending against him in state court.

Mr. Harrell's attorney responded that his client had "[f]rom day one" been willing to enter a guilty plea.  He explained that when it became apparent that the government would not agree to a deal similar to that received by the co-defendants, he suggested that Mr. Harrell and the government make a joint request for a 20-year sentence.  He then said that Mr. Harrell "is willing to do that today[,]" but his "difficulty really is getting the [g]overnment to budge."

The district court then, in what it referred to as "thinking out loud," made the suggestion of postponing the federal prosecution to allow the state court to proceed

with its charges against Mr. Harrell and then revisit the federal case depending on the outcome in state court.  The district court noted that in the federal case Mr. Harrell was facing a "horrendous mandatory sentence that becomes somewhat irrevocable after a trial if there is a conviction."  After expressing its skepticism with the timeliness of the state court process, the government rejected the district court's proposal.  After Mr. Harrell's attorney again emphasized that his client was ready to accept a plea and receive a sentence of 20 to 25 years, the district court put forth another option.  It asked the parties if it would be a "doable resolution" to have Mr. Harrell enter a plea now with a recommended sentence of 20 or 25 years and postpone sentencing until the completion of the state court cases.  The prosecutor agreed to speak with a supervisor regarding this proposal, and the district court took a 30-minute recess for that purpose.

After the recess, the prosecutor stated that the government would be willing to offer Mr. Harrell a plea to an agreed upon 25-year sentence, but without postponing sentencing. Mr. Harrell's attorney immediately responded as follows: "[I]n the past, [Mr. Harrell] has indicated to me a willingness to resolve the case with that type of a sentence.  Today, after sort of getting here to the brink, I believe he's talked himself into the inevitable trial.  I'm a little concerned that he is acting rashly."

Mr. Harrell's attorney asked the district court to continue the trial for a few days so he could have time over the weekend to speak with his client and his client's family. After hearing from the government, the district court rejected Mr. Harrell's request for more time and instead decided to begin the joint trial: "We have really gone a long way to try to work something out for these two young people. We have done it in the interest of arriving at pure justice. We have done our best. So we will summon the jury and commence trial."

Mr. Harrell's attorney, Mr. Dantzle's attorney, and the prosecutor then participated in the jury selection process. Upon the seating of a jury, the district court recessed for lunch. Immediately upon returning from the lunch recess, Mr. Harrell's attorney advised the district court that Mr. Harrell wanted to accept a plea if the district court and government were still willing to give him a sentence of 25 years. The prosecutor agreed. The district court stated that it would take up the change of plea and sentencing at the end of the day and in the meantime would proceed with the trial, specifically advising Mr. Harrell that he would need to sit through the afternoon session of the trial but would not be waiving any rights by not participating in opening statements or cross-examination.

At the end of the day, after the government completed its case against Mr. Dantzle, and Mr. Dantzle advised the district court that he would not be testifying, the district court accepted Mr. Harrell's guilty plea and sentenced him to the

7

agreed upon 25 years of imprisonment.    The next day, following closing arguments, the jury returned a guilty verdict against Mr. Dantzle.

**B**

Rule 11(c)(1) provides that "[a]n attorney for the government and the defendant's attorney, or the defendant when proceeding *pro se*, may discuss and reach a plea agreement. The court must not participate in these discussions."  We have held that Rule 11(c)(1) creates a "bright line rule" that prohibits "the participation of the judge in plea negotiations under any circumstances . . . [and] admits of no exceptions." *United States v. Johnson*, 89 F.3d 778, 783 (11th Cir. 1996).  This prohibition serves two important purposes:

> First, because a trial judge's actual impartiality may be impaired as a result of having participated in plea discussions, the rule serves to safeguard the trial judge's actual neutrality. Second, because participation may give the impression that the trial judge is no longer a neutral arbiter, the rule also serves to protect the appearance of impartiality.

*United States v. Tobin*, 676 F.3d 1264, 1304 (11th Cir. 2012) (internal citations omitted).  A review of the entire record leads us to conclude that the district court improperly participated in Mr. Harrell's plea negotiations with the government.

First, the district court instigated—without any mention of possible plea agreements from the parties—the plea-related discussions with counsel for both Mr. Harrell and Mr. Dantzle and the government.  This was a violation of Rule 11(c)(1), for "[t]he district court's role under Rule 11 is to evaluate a plea

agreement once it has been reached by the parties and disclosed in open court." *United States v. Diaz*, 138 F.3d 1359, 1363 (11th Cir. 1998). This limited role exists because "statements and suggestions by the judge are not just one more source of information to plea negotiators; they are indications of what the judge will accept, and one can only assume that they will quickly become the focal point of further discussions." *Id.* (internal quotation marks omitted). Here, once the district court opened the door to plea-related discussions, it impermissibly engaged in constructing or shaping a plea for Mr. Harrell and commented upon terms that it would accept.

Second, the district court improperly cautioned Mr. Dantzle, in the presence of Mr. Harrell, about the severity of his potential 32-year sentence should he be convicted after a trial, compared to the seven-year sentence he faced if he pleaded guilty. The district court also generally warned both Mr. Dantzle and Mr. Harrell about the extremely high sentences they were facing should they be convicted, and explained that it would not have the same latitude to fashion a fair sentence if the defendants were found guilty by the jury. *See United States v. Casallas*, 59 F.3d 1173, 1176-78 (11th Cir. 1995) (holding that the district court improperly participated in plea discussions by contrasting the 10-year sentence faced by the defendant if he pleaded guilty with the 15-year sentence that would follow if the defendant were found guilty after a trial). *See also Diaz*, 138 F.3d at 1363 (finding

9

a Rule 11 violation "because the sentencing judge took an active part in discussing [the defendant's] probable sentence before the time of his conviction and because she commented on the weight and nature of the evidence against him").

Third, and as to Mr. Harrell specifically, the district court not only became involved in the parties' plea discussions, it also took the lead in orchestrating the plea agreement ultimately entered into by Mr. Harrell and the government. As we have detailed, despite his earlier attempts to reach a plea agreement, including his expressed willingness to plead to an agreed 20- or 25-year sentence, the government had been adamant in not offering Mr. Harrell anything less than a term of imprisonment of 32 years. After some discussion, the district court proposed that Mr. Harrell enter a guilty plea in exchange for an agreed upon 25-year sentence, to be imposed following the outcome of the pending state court cases. Mr. Harrell expressed his agreement with this arrangement and the government sought authorization to make such an offer, which it received so long as the sentencing took place at the present time. On this record, we would be hard-pressed to say that the district court did not involve itself in the parties' plea discussions.

We realize that the district court was acting in what it believed to be Mr. Harrell's best interests, and was concerned about the lengthy sentence it would have to impose if Mr. Harrell was found guilty by a jury. Nevertheless, there is no

10

good motives exception to the bar on judicial participation in plea discussions. Accordingly, we do not hesitate in concluding that the district court violated Rule 11(c)(1), and in holding that this error was plain. *See Tobin*, 676 F.3d at 1307 (explaining that even well-intentioned judicial participation in plea discussions is prohibited).

## C

This, of course, is not the end of the matter. As the Supreme Court recently held in *Davila*, Mr. Harrell must also show that this error affected his substantial rights, meaning that the entire record must bear out the conclusion that "it was reasonably probable that, but for the [district court's] exhortations, [Mr. Harrell] would have exercised his right to go to trial." 133 S. Ct. at 2150. *See also United States v. Castro*, 736 F.3d 1308, 1314 (11th Cir. 2013) (explaining that the defendant must show that "but for the error [of the district court], he would not have entered the plea"). A fair reading of the entire record leads us to conclude that the district court's error affected Mr. Harrell's substantial rights.

Mr. Harrell arrived at court prepared to go to trial, the prospective jurors were waiting to be called, and the government's witnesses were all present. Although Mr. Harrell indicated that he had been willing to plead guilty, even to 20 or 25 years of imprisonment, his attorney and the prosecutor explained that the parties had failed to reach an agreement. The government had been unwilling to

offer a plea to anything less than 32 years of imprisonment, which Mr. Harrell had continuously rejected.  There simply was no viable plea offer that Mr. Harrell was willing to accept when everyone arrived ready to begin the joint trial.

As noted, however, the district court did not commence the trial, but instead engaged Mr. Harrell and the government in lengthy plea-related discussions and engineered the plea deal that the government ultimately offered during the morning session and that Mr. Harrell accepted just after the lunch recess.  In our view, it is reasonably probable that, but for the district court's violation of Rule 11(c)(1), Mr. Harrell would have decided to go to trial.  *See Davila*, 133 S. Ct. at 2150.  When Mr. Harrell arrived ready to begin his trial, there was no viable plea offer on the table.  The district court issued several warnings about the severity of the sentences that would result should the defendants be convicted after a trial, and, most significantly, shaped the more favorable plea agreement that Mr. Harrell had been seeking all along.

We recognize that Mr. Harrell did not immediately agree to the 25-year plea deal as soon as the prosecutor reported that it had been approved.  Indeed, his attorney stated that he still wanted to go to trial and participated in jury selection.  Still, we conclude that the district court's improper involvement made a difference in Mr. Harrell's decision to enter a guilty plea.  *See Castro,* 736 F.3d at 1314.  At most, only a few hours separated Mr. Harrell's initial rejection of the plea offer and

his acceptance of it immediately upon commencement of the proceedings after the lunch recess. *See Davila*, 133 S. Ct. at 2149 (explaining that timing is a particular fact and circumstance to consider). Although timing alone is not dispositive, *see Castro*, 736 F.3d at 1314, we cannot say, given the extent of the district court's involvement, that the passage of such a short period of time would have appreciably negated the impact of the district court's statements on Mr. Harrell's decision-making.[1]

Turning to the last factor of the plain error standard, we hold that the district court's error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." As the Supreme Court observed in *Davila*, Rule 11(c)(1)'s prohibition on judicial participation in plea discussions exists because of "concern that a defendant might be induced to plead guilty rather than risk displeasing the judge who would preside at trial," and "would facilitate objective assessments of the voluntariness of a defendant's plea." 133 S. Ct. at 2146. The district court's violation of Rule 11(c)(1) in this case frustrated both of those purposes. The

---

[1] Our recent decision in *United States v. Davila*, ___F.3d___, 2014 WL 1428018 (11th Cir. April 15, 2014), in which we concluded that the defendant had failed to establish prejudice from a Rule 11(c)(1) violation, is distinguishable. First, the district court's involvement here was significantly more extensive than that of the magistrate judge in *Davila*. Second, the Rule 11(c)(1) violation in *Davila* was committed by a magistrate judge, and not by the district court which ultimately accepted the defendant's plea. Third, the defendant in *Davila*, unlike Mr. Harrell, had signed a plea agreement before deciding that he wanted to go to trial, thereby indicating that the parties had reached a deal before the Rule 11(c)(1) violation. Fourth, the defendant in Davila entered a guilty plea three months after the Rule 11(c)(1) violation.

district court was not pleased with the decision of Mr. Dantzle to go to trial, going so far as to question his mental stability, so there is reasonable concern that Mr. Harrell would have felt pressure to plead guilty, especially after the district court essentially came up with the terms of the plea agreement that the government ultimately offered to him.  Additionally, given the extensiveness of the district court's involvement, any objective assessment of the voluntariness of Mr. Harrell's guilty plea is significantly weakened.

We conclude that Mr. Harrell has met his burden in establishing that the district court's violation of Rule 11(c)(1) constitutes reversible plain error. We therefore vacate the conviction and allow Mr. Harrell to withdraw his guilty plea on remand.  *See Casallas*, 59 F.3d at 1178 (holding that defendant must be permitted to withdraw his guilty plea if the district court participated in the plea discussions).  We also direct that the case be reassigned "as a means to extend the prophylactic scheme established by Rule 11 and to prevent the possible misimpression created by the [district court's] participation."  *United States v. Corbitt*, 996 F.2d 1132, 1135 (11th Cir. 1993).[2]

---

[2] Given our resolution of the Rule 11(c)(1) issue, we need not and do not address Mr. Harrell's argument that the district court committed other errors in conducting the change of plea colloquy.

## II

Mr. Dantzle raises four challenges to his convictions and sentences. We reject three of them without further discussion,[3] and address only his contention that the district court erred in allowing the government to present expert testimony from Detective Mitch Jacobs with respect to cell phones and cell towers. Although we agree that the district court abused its discretion in permitting the expert testimony, *see Maiz v. Virani*, 253 F.3d 641, 662 (11th Cir. 2001) ("a trial court's evidentiary rulings on the admission of expert witness testimony [are reviewed] only for abuse of discretion"), we conclude that the testimony was harmless because it did not affect Mr. Dantlze's substantial rights.

## A

Detective Jacobs, a Miami-Dade Police Detective who had been deployed to the Bureau of Alcohol, Tobacco, and Firearms for the past 23 years, testified for the government at trial about the use of Mr. Dantzle's cell phone before, during, and after the time of the two robberies. Before he did so, the government explained that it had created maps containing data that it had received from

---

[3] We conclude that there was sufficient evidence to convict Mr. Dantzle of aiding and abetting violations of 18 U.S.C. § 924(c) during the Walgreens and McDonald's robberies, *see Rosemond v. United States,* 134 S. Ct. 1240, 1249 & n.9 (2014); that the prosecutor's closing argument did not shift the burden of proof, *see United States v. Bazan,* 637 F.2d 363, 367-68 (5th Cir. 1981); and that Mr. Dantzle's 401-month sentence, which included mandatory and consecutive sentences of 60 and 300 months for the firearms offenses, was constitutional, *see United States v. Rawlings,* 821 F.2d 1543, 1545 (11th Cir. 1987); *United States v. Johnson,* 451 F.3d 1239, 1243 (11th Cir. 2006).

15

MetroPCS, the cellular phone provider, regarding Mr. Dantzle's cell phone number and the location of various MetroPCS cell towers.   Mr. Dantzle's attorney objected, arguing that "the government should have to produce somebody who works in that area, an expert, somebody to produce what they mean instead of just having a jury look at sheets that pinpoint areas.  They need an expert to explain the purpose of it, the cell towers, how phones pick up signals from the towers.  Even if the records are self-authenticating under the rules of evidence, that doesn't explain to the jury the significance of those."  The district court overruled this objection.

The government questioned Detective Jacobs about the raw billing data that it obtained from MetroPCS for the cell phone number 786-523-1283, which had been linked to Mr. Dantzle.  Detective Jacobs testified that the data included the date, time, duration, and direction (incoming or outgoing) of calls, as well as the cell tower location for the beginning of the call and the one for the end of the call. When the government proceeded to ask Detective Jacobs to explain what happens to a transaction signal when a call is placed from a cell phone, Mr. Dantzle's attorney objected, this time on the grounds that the witness was not qualified to answer such a question and that there had been no foundation for his experience in this area.  When the government responded that Detective Jacobs had substantial lay experience in the area of cell phone tracking, the district court directed the government to establish that experience.

Detective Jacobs explained that he had previously testified about the location of cell phones and that he personally goes out to observe cell tower locations.  The district court asked if the government was tendering him as an expert, and the government responded, "Yes, Your Honor."  The district court, over Mr. Dantzle's objection, then certified Detective Jacobs as an expert in "this field of the relationship between these [cell] phones, the [cell] towers, and the information that can be obtained from those who are qualified experts."  The district court went on to state, in the jury's presence, that Detective Jacobs "can express opinions.  Only an expert can express opinions."

Following the district court's ruling, Detective Jacobs testified about how a cell tower receives a transmission when someone places or receives a call on a cell phone.  He stated that "the phone sends out a signal to the nearest, most of the time, the nearest tower," and that this tower will then call the number the caller is trying to reach.  He explained that a cell tower has three sides and that a call will register on the side of the tower where the phone is actually located, although the cell phone is not necessarily right next to the cell tower.

Detective Jacobs also testified that he visited the three cell tower locations that had been "hit" by cell phone number 786-523-1283 and created maps which showed these towers, as well as the Walgreens and McDonald's which had been

17

robbed.  He testified that the cell phone was in this area just prior to the two robberies.

**B**

Mr. Dantzle argues that the district court erroneously permitted Detective Jacobs to testify as an expert on the relationship and interaction between cell phones and cell towers without requiring the government to comply with the requirements for expert witness opinion testimony pursuant to Federal Rule of Evidence 702.  The government responds that the district court improperly labeled Detective Jabobs' testimony as expert opinion; as the government sees it, Detective Jacobs merely testified as a lay witness based on his experience as law enforcement officer.

We agree with Mr. Dantzle that the district court certified Detective Jacobs as an expert and permitted him to offer his expert opinion regarding cell phones, cell phone towers, and the information that can be obtained from their interaction. The district court unequivocally asked the government if it was tendering Detective Jacobs as an expert, and the government responded affirmatively.  Moreover, the district court identified the area of expertise in which he would be certified, and stated, in the presence of the jury, that Detective Jacobs could express opinions as an expert.  We therefore turn to whether the district court abused its discretion in permitting Detective Jabobs to testify as an expert.

18

Before a witness can testify as an expert, the party presenting his testimony must, among other things, show that the witness "is qualified to testify competently regarding the matters he intends to address." *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (internal quotation marks and citation omitted). We need not, in this case, decide whether a witness who is going to testify as Detective Jacobs did must qualify as an expert. *Compare United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011) (agent's testimony about how cell towers work constitutes expert testimony), *with United States v. Feliciano*, 300 F. App'x 795, 801 (11th Cir. 2008) (agent's testimony about cell tower sites and records of cellular calls was not an expert opinion). Suffice it to say that the government tendered Detective Jacobs as an expert witness, but failed to establish, by a preponderance of the evidence, *see Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005), that he was qualified as an expert. The district court, therefore, abused its discretion in allowing Detective Jacobs to testify as an expert over Mr. Dantzle's timely objections.

Reversal is not warranted, however, because the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *United States v. Phaknikone,* 605 F.3d 1099, 1109 (11th Cir. 2010). In addition to Detective Jacobs' testimony, the government presented the testimony of a co-defendant, Daniel Jenkins, who told the jury in specific detail how Mr. Dantzle

19

proposed the first robbery (of the Walgreens) and participated in both robberies, and also identified him as one of the masked men in videos and photographs taken during the robberies.

### III

As to Mr. Harrell, we conclude that the district court committed reversible plain error when it improperly participated in the parties' plea negotiations, and accordingly vacate Mr. Harrell's convictions and sentence. The case is remanded with instructions that it be reassigned to a different district judge as to Mr. Harrell, who should be permitted to withdraw his guilty plea.

As to Mr. Dantzle, we affirm his convictions and sentence.

**VACATED in part, REMANDED in part, and AFFIRMED in part.**